## L. & I. RIGGIN vs. THE PATAPSCO INSURANCE COMPANY.— June, 1826.

On a marine policy of insurance against particular risks, the underwriter is supposed tacitly to assent to all reasonable efforts which the master may find it necessary to make for the safety of the property insured, and its transportation to the port of destination, and to authorise him to avoid urgent danger, whether such danger be from a peril insured against or not.

There is no distinction between cases of physical and moral necessity as justifications for departure from the course of the voyage.

In every contract of marine insurance, it is the obligation of the assured to provide a master of competent skill and prudence; and if in a change of the course of the voyage a loss happen, which may be justly attributed to the master's not being of that character, the insurance is discharged.

The mere apprehension of danger, not founded upon reasonable evidence, does not justify a deviation. The peril apprehended must be such as, if encountered, loss or serious injury is the necessary consequence; the danger must be imminent and obvious, not problematical or contingent—

In an action of *covenant* on a policy of insurance, against the usual risks, on a vessel "from *Baltimore* to *St. Barts*, and at and from thence to *St. Martha* on the *Spanish Main*, with the privilege of returning to *St. Barts*, or using three other ports on the *Main*, or in the *West Indies*," dated the 5th of May 1821—it appeared that the vessel sailed the 5th May, 1821, and arrived at *St. Barts* the 28th; that the captain and supercargo were there informed that *St. Martha*, which at the time of the vessel's leaving *Baltimore* was in the possession of the *Patriots*, had fallen into the hands of the *Royalist Spaniards*; and having learned that the same port, on a former occasion, having been in the possession of the *Patriots*, had fallen into that of the *Royalists*, who had, by keeping the *Patriot* flag flying, decoyed vessels into port, and confiscated them; and learning at *St. Barts*, that *Marguarita*, a *West India Island*, was the best place to acquire information as to the situation of *St. Martha*, proceeded there. On getting there, learning that *St. Martha* was still in the possession of the *Patriots*, the vessel proceeded without loss of time to that place, and in the direct course of the voyage there, was lost by the perils of the sea. *Marguarita* was not in the usual tract of a voyage from *St. Barts* to *St. Martha*.

*Held*, that the going to *Marguarita* was a deviation which discharged the underwriters. That the danger apprehended by the captain of condemnation at *St. Martha*, was not so *obvious* or *imminent*, as to excuse the departure. That as it was not alleged, that on the occasion when condemnations were proved to have been made at that port before, *American* or neutral vessels had been condemned, such acts of outrage could not be imputed to the agents of a civilized nation.

*Held* also, that as there appeared to have been another port in the direct voyage from *St. Barts* to *St. Martha*, at which the master might have obtained the information as to the condition of *St. Martha*, it was his duty to have known that fact, and to have gone to such port for information, if

the danger of condemnation at *St. Martha* had been obvious and imminent.

Where there is no evidence before the jury of a fact, or the evidence offered is so vague and indefinite that no rational inference of such fact can be deduced from it, the court ought to direct the jury that it is not competent for them to find such fact.

Where the facts are admitted, the question of deviation is one of law.

There is no difference between a statement in a bill of exceptions, that certain facts were *proved,* and that evidence *was offered of them.*

Appeal from *Baltimore* County Court. . This was an action of covenant, brought by the insured, (the appellants,) against the insurers, (the appellees,) upon a policy of insurance. on the schooner *Two Brothers,* at and from *Baltimore* to *St. Bartholomews,* &c. for a total loss by the perils of the sea.' The defendants pleaded *non infregit conventionem,* and issue was joined.

At the trial the plaintiffs gave in evidence the policy of insurance declared upon, which was duly proved, dated the 5th of May 1821, in which it is set forth "that the *Patapsco Insurance Company* have insured, and hereby do insure, *L. & I. Riggin,* as well in their own name as in the name or names of all and every other person or persons to whom the same doth, may or shall appertain, in part or in the whole, lost or not lost, at and from *Baltimore* to *St. Barts,* and at and from thence to *St. Martha,* on the *Spanish Main,* with the privilege of returning to *St. Barts,* or using three other ports on the *Main,* or in the *West Indies,* and at and from any of them back to *Baltimore,* two thousand dollars, upon the body, tackle, apparel, and other furniture of the schooner, called *Two Brothers,* whereof is master for the present voyage, —— *Cochran,* or whoever else shall go for master in the said vessel. Beginning the adventure upon the said vessel, tackle, apparel and furniture, at and from *Baltimore* aforesaid, and continuing the same until the said vessel be arrived at the ports aforesaid, and until she be moored there twenty-four hours in good safety: the said vessel, her tackle, apparel and furniture, for so much as concerns this insurance, by agreement between the insured and the insurers, are and shall be valued at ————. And it shall and may be lawful for the said vessel, .in her voyage, to proceed and sail to, touch and stay at, any ports or places, if

thereunto obliged by stress of weather, or other unavoidable accident, without prejudice to this insurance. The adventures and perils which we, the insurers, are contented to bear and take upon us in this voyage are, of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, unlawful arrests, restraints and detainments, of all kings, princes and people, of what nation, condition, or quality soever, barratry of the master and mariners, and all such other perils, losses and misfortunes, that have or shall come to the hurt, detriment, or damage of the said vessel, or any part thereof, as insurers are legally accountable for; warranted, nevertheless, by the insured, free from any charge, damage or loss, which may arise in consequence of a seizure or detention of the said schooner, or of the goods laden or to be laden therein, by reason or on account of any illicit or prohibited trade, or trade in articles contraband of war," &c. The plaintiffs further proved, that at the time the insurance was effected, and at the time of the loss hereinafter mentioned, the said vessel was the property of the plaintiffs. That said vessel being tight, staunch and strong, sailed on the voyage insured, on the fifth day of May 1821, and arrived at *St. Barts* on the 28th day of the same month; that the captain and supercargo were there informed, and had good reason to apprehend, that *St. Martha*, which at the time of the sailing from *Baltimore*, was in the possession of the *Patriots*, had fallen into the hands of the *Royalist Spaniards*, and having learned that the same port on a former occasion having been in possession of the *Patriots*, had fallen into the hands of the *Royalists*, who had, by keeping the *Patriot* flag flying, decoyed vessels into port, and seized, detained and confiscated them; and apprehending a similar fate, and learning at *St. Barts* that *Marguarita*, a *West India Island*, was the best and safest port or place at which to acquire information relative to the situation of *St. Martha*, proceeded there; and having learned there that *St. Martha* was still in the possession of the *Patriots*, without loss of time proceeded directly for that port, and in the direct course of her voyage, was wholly lost by the perils of the sea. The defendants, on their part, offered evidence that the said schooner *Two Brothers*, on her arrival at *St. Bartholemews*, in the prosecu-

tion of the voyage insured, learnt by rumours there prevailing, that *St. Martha* was in the possession of the *Royalists* forces of the government of *Spain*, and that it would be unsafe to proceed there, as by the colonial laws of *Spain* all intercourse was interdicted between foreigners and her colonies. And the defendants further offered evidence, that *Marguarita* was at the distance of 600 miles from *St. Martha*, and was much out of the usual track of a voyage from *St. Barts* to *St. Martha*, and was never pursued by a vessel, having the aforesaid port in view as her immediate destination; that the island of *Curracoa* is in the direct route of the voyage from *St. Barts* to *St. Martha*, and that it is more than one third less in the actual distance than *Marguarita*, and about 300 miles distant from *St. Martha*; that *Curracoa* was an open port, free for the reception of *Spanish* and *Colombian* vessels of war, and for the vessels of all other nations, and that constant intercourse was kept up between *Curracoa* and *St. Martha*, and that information in relation to the last mentioned port, would be heard at *Curracoa*, in the course of three or four days, that being the usual length of the voyage between those places, and that *Curracoa* was resorted to by neutral vessels for intelligence as to the state of the *Spanish Main*. That *Curracoa* is a place of deposit or *entre port* for large quantities of merchandize which are intended to be carried to the different ports on the *Spanish Main*, and which are from time to time, placed there, and removed according to the state of the market and the situation of the ports on the *Main*, whether in the possession of the royalists or independents, and that these facts in relation to *Curracoa*, were well known in *Baltimore*, previous to, and at the time of, the sailing of the said vessel on the voyage insured. And the defendants further offered evidence, that the said vessel sailed from the port of *St Barts* for *Marguarita*, having no other information of the actual state of *St. Martha* than what they received in the general rumour which prevailed at *St. Barts*; and that it was well known at *St. Barts* that *Curracoa* was the nearest place to *St. Martha*, where correct information was at all times to be obtained, of the state and condition of the government at *St. Martha*. And the defendant also offered evidence that the said vessel remained at *Marguarita* for the

period of four days after her arrival, having been detained by the officers of the government of that place, who kept the register of said vessel till that time.   And the defendants also offered evidence, that *St. Martha* had not been in the possession of the *Royalists*, and that the information received at *St. Barts* on that subject, was wholly unfounded.   That the vessel sailed from the port of *Marguarita* on a voyage to the port of *Maracaybo*, another port on the *Spanish Main*, having altogether abandoned the voyage to *St. Martha*, and that in the prosecution of the voyage to *Maracaybo* she was lost on the island of *Little Curracoa*, which lies between the ports of *Marguarita* and those of *Maracaybo* and *St. Martha*, and that the said last mentioned island is in the direct route to both of the said ports. The defendants further offered evidence, that the said vessel received on board, at the port of *Baltimore*, previous to her sailing on the voyage insured, three or more military officers in the service of the *Colombian Republic*, one of the independent governments of *South America*, for the purpose of transporting them to *St. Martha*, to unite with the military forces of said republic, in the war then carrying on between *Spain* and the said *Republic*, and that the said officers remained on board said vessel at the time of her loss on the island of *Little Curracoa*.   And the plaintiffs then offered evidence to disprove the whole of the facts stated in the preceding case of the defendants; and moved the court to direct the jury, that if they should believe, that upon the arrival of the vessel insured at *St. Barts*, it was generally reported that *Santa Martha* was in possession of the *Royalists*, and that the master and supercargo were informed at *St. Barts*, and verily believed, that *Marguarita* was the best and nearest place to obtain information relative to the situation of *Santa Martha*, and that the master of said vessel, in the exercise of an honest and sound discretion, went to *Marguarita* for information, that then his proceeding there was no deviation, and that the plaintiffs were entitled to recover for a total loss.   Which instruction the Court, [*Archer* Ch. J. and *Ward*, A. J.] refused to give. The plaintiffs excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued before Buchanan, Ch. J. and Earle, Stephen, and Dorsey, J.

*Meredith,* for the Appellants. The question is, whether under the circumstances stated in the bill of exceptions the captain of the vessel insured was guilty of such a deviation in proceeding to *Marguarita,* as will discharge the insurers from responsibility for the loss that subsequently occurred? The negative of this proposition will be contended for on the part of the appellants. To exonerate the insurers by a deviation, it must be a voluntary departure from the voyage insured. A departure, proceeding from necessity, is excusable. The deviation in this case, was a justifiable one, and could not affect the insurance. Where the deviation proceeds from a fear of danger, arising from well grounded information, it is excusable. Where the vessel, from stress of weather, is driven into a port out of the course of the voyage insured, or by mutiny of the crew, or in avoiding capture, &c. the insurance is not affected. To show that this was a justifiable deviation, he cited *Reade & Jephson vs. Commercial Insurance Company,* 3 *Johns. Rep.* 352. *Phillips on Ins.* 192, 194, 195. *Oliver vs. Maryland Insurance Company,* 7 *Cranch,* 493. *Whitney vs. Hayden,* 13 *Mass. Rep.* 172. *Patrick vs. Ludlow,* 3 *Johns. Cas.* 10. *Smith vs. United Insurance Company,* 1 *Johns. Rep.* 249. *Lee vs. Gray,* 7 *Mass. Rep.* 349. *Hadkinson vs. Robinson,* 3 *Bos. & Pull.* 388. 1 *Park,* 262. *Enderby vs. Fletcher,* at *N. P.* 1780, Per Lord *Mansfield. Graham vs Commercial Insurance Company,* 11 *Johns. Rep.* 352. 1 *Marsh.* 205. *The Santissima Trinidad,* 7 *Wheat.* 283. Even if the peril was not insured against yet the deviation was justifiable. A policy of insurance is to be construed for the advantage of trade —for the benefit of the insured, and according to the intention of the parties. 1 *Marsh.* 304, 204. To show that the deviation was justifiable, although the risk against which it was the intention to guard was not insured, he cited *Lubbock vs. Rowcroft,* 5 *Esp. Rep.* 50. *Saltus vs. United Insurance Company,* 15 *Johns. Rep.* 526. *Green vs. Elmslie, Peake's N. P.* 212. *Scott vs. Thompson,* 4 *Bos. & Pull.* 181. *Robinson vs. Marine Insurance Company,* 2 *Johns. Rep.* 89. *Phill.*

*on Ins.* 214. *United States vs. Palmer,* 3 *Wheat.* 610, 636. *The Divina Pastora,* 4 *Wheat.* 52. *Richardson vs. Maine Insurance Company,* 6 *Mass. Rep* 105. *Earle vs. Rowcroft,* 8 *East.* 126. *Barker vs. Blakes,* 9 *East,* 283. *Bird vs. Appleton,* 8 *T. R.* 562. *Vasse vs. Ball,* 2 *Dall.* 270. 1 *Marsh.* 439, 449, 415, 434, 436, 203. *Marine Insurance Company vs. Tucker,* 3 *Cranch,* 357.

*Mayer,* for the Appellees. There is no difference between a statement in a bill of exceptions, that certain facts were proved, and that they were offered in evidence. Where a vessel goes out of the course of the voyage insured in order to avoid a peril not insured against, the insurance is void, and the insurers are discharged. *Breed vs. Eaton,* 10 *Mass. Rep.* 21. *Roget vs. Thurston,* 2 *Johns. Cas.* 248. *O'Reilly vs. The Royal Exchange Insurance Company,* 4 *Campb.* 248. *Parkin vs. Tunno,* 11 *East,* 22. The privilege of deviation is a limited one. It was for the jury to determine whether it was a discreet apprehension of the captain so as to induce him to deviate from the direct voyage; and that if it was necessary for him to deviate, whether he did go to the nearest port to obtain the information required. *Oliver vs. Maryland Insurance Company,* 7 *Cranch,* 493. *Phillips on Ins.* 192, 193. 1 *Marsh.* 195, 204. *Park,* 264. The deviation must be for the benefit of the parties concerned. 1 *Marsh.* 205. *Phill. on Ins.* 235. *Richardson vs. Maine Insurance Company,* 6 *Mass. Rep.* 121. *Smith vs. Universal Insurance Company,* 6 *Wheat.* 176. *Polk vs. Fitzgerald, Willes,* 641. In March 1822 the independence of *Colombia* was recognized by the government of the *U. S.* 22 *Niles's Reg.* 147. The *U. S.* recognized the existence of a civil war in that country. *The Santissima Trinidad,* 7 *Wheat.* 337. *United States vs. Palmer,* 3 *Wheat.* 610. *The Divina Pastora,* 4 *Wheat.* 52.

*Purviance,* on the same side. Until the mother country acknowledges the independence of its province, it remains as a part of the mother country, no matter whether there be a war carried on between them or not. Trade with such province, if permitted by the mother country, must be carried on as if it were not an independent country; but if the intercourse is in-

terdicted by the mother country, then a trade with the colony would be an illicit one.    There is a distinction between a warranty, and a violation from necessity of any part of the policy containing a mere statement.    The warranty ties up the insured to a performance to its letter.  1 *Marsh* 346, 349.    If the warranty is violated, the policy is at an end.    In the case of a deviation if the danger consists of being captured on entering a port, it would be allowed if there was no warranty.    If to avoid the peril is for the benefit of all the parties, it is allowable. But if it proceeds from a peril not insured against, though it be a matter of prudence for the benefit of the insured, yet the assurer is not answerable in case of a loss.    The violation of the laws of the country of the assured and assurer absolves the insurance; but the violation of the laws of a foreign country does not vitiate the policy.    *Livingston & Gilchrist vs.* M*aryland Insurance Company,* 7 *Cranch,* 540.    *Rose vs. Himely,* 4 *Cranch,* 272.    *Gelston vs. Hoyt,* 3 *Wheat.* 324.    *United States vs. Palmer, Ibid* 634.    The prayer to the court in the bill of exceptions was grounded on a part only of the evidence. What difference was it whether *St. Martha* was in possession of the *Royalists* or of the *Patriots?*    There might be a difference if the *Royalists* would pursue the same line of conduct which they had pursued on a former occasion, but that, by the form of the prayer, was thrown out of the view of the jury.

*Mitchell,* in reply, referred to *Phill. on Ins.* 191, 192, 193, 195, 196, 228, 148, 149, 150, 8, 276, 277, 296, 234, 293, 294, 216, 223.    *Stocker vs. Harris,* 3 *Mass. Rep.* 417.    *Lee vs. Gray,* 7 *Mass. Rep.* 349.    *Schmidt vs. United Insurance Company,* 1 *Johns. Rep.* 262.    1 *Marsh.* 207, 346, 270. 4 *Wheat.* (*Appendix, note* 2.)    *United States vs. Palmer,* 3 *Wheat.* 610.    *The Santissima Trinidad,* 7 *Wheat.* 337. *Oliver vs.* M*aryland Insurance Company,* 7 *Cranch,* 494, 495, 496.    *Vattel,* B 3, ch. 18, s. 295, 296, page 426, 427. 2 *Phill. Evid.* 60, (*note.*) 1 *Marsh.* 346, (*note* 55,) 78, (*note* 2.)    *Earle vs. Rowcroft,* 8 *East,* 126.    *Vasse vs. Ball,* 2 *Dall.* 274.    *Church vs. Hubbart,* 2 *Cranch,* 187, 232, 234.    *Bird vs. Appleton,* 8 *T. R.* 562.    *The Schooner Rapid,* 1 *Gall.*

*Rep.* 303. *Scott vs. Thompson*, 4 *Bos.* & *Pull.* 181. *Reade* & *Jephson vs. Commercial Insurance Company*, 3 *Johns. Rep.* 352. *The Ship Argo*, 1 *Gall. Rep.* 157. *O'Reilly vs. The Royal Exchange Ins. Co.* 4 *Camp.* 248; and *Johnston vs. Ludlow*, 1 *Caine's Cas.* Appen. XXIX.

Dorsey, J. delivered the opinion of the Court. The right to the appellants to recover in this action, seems to have been resisted in the court below, simply on the ground that the sailing of the schooner *Two Brothers* from *St Barts*, to *Marguarita*, under the circumstances of the case, was a deviation by which the underwriters were discharged from all liability on the policy. But the appellees here contend, that the judgment rendered is correct for various reasons. *First.* They insist that every deviation to avoid a peril not insured against absolves the assurers. To examine this point independently of decisions on the subject, the court think it stands relieved from all difficulty or doubt. In construing a policy of insurance, the court should give it a fair and liberal interpretation, such as, under all the circumstances of the case, appears most consonant to the intention of the parties at the time the contract was formed. The design of the assured, being to provide for themselves an indemnity against loss, from which the insurers engage to protect them, such a construction should be placed on their compact as, according to the understanding of the parties and nature of the transaction, will effectuate that object. Mercantile negociations should never depend on subtleties and niceties, but upon rules founded on common sense and justice, a knowledge of which would therefore be readily acquired by the community at large. Policies of insurance may be considered either as universal, embracing all manner of risks, or special, being confined to one or more specified perils. On the latter description of policies only, can the question now under consideration ever arise. As to all risks, not insured against, the owner becomes his own underwriter; when an insurer assumes a responsibility for all losses, for example, arising from sea risks only, can it be presumed to be the understanding or agreement of the parties to the policy, that the insured relinquished all right to escape capture from pirates, or elude other imminent peril, by fly-

ing for protection to a neighbouring port out of the usual course of the voyage? If such be the operation of a contract of insurance, not universal, instead of providing for the insured an indemnity against loss, it serves but to paralise his efforts for the safety of his property, and to impose on him new duties and restrictions which enhance his dangers. "A deviation is a voluntary departure, without necessity or reasonable cause, from the regular and usual course of the voyage." How can that digression from the course of the voyage be said to be "without necessity or reasonable cause," which is made to avoid an imminent peril of capture, or other disaster necessarily resulting in the entire loss of the subject matter of insurance? If not, then such a departure being no deviation, is justifiable, and impairs not the liabilities of the underwriters. Suppose the common case of a general ship, where the cargo is owned by many different persons, each of whom insure against separate risks; upon the occurrence of a peril, insured against by any one owner, the captain becomes the joint agent of such owner and his underwriter, and is in duty bound to avoid the danger even by a digression from the course of the voyage; and yet in such a case, if the doctrine contended for be correct, all the underwriters, upon other parts of the cargo, would be absolved from their engagements—In manifest violation of the intentions of all the parties, and contrary to every idea of common sense and justice. The court think that the insurer must be presumed to be acquainted with the usages and accidents to which the property insured may be subjected in the course of the voyage; that they are contemplated by him at the time of his contract, enter into and become a part of it; and that although he is *only* answerable for losses flowing *immediately* from the perils against which he insures, yet that viewing the captain as the agent of the owner, he tacitly assents to all reasonable efforts, which he may make for the safety of the property insured, and its transportation to the port of destination; and consequently authorises the usual means of avoiding urgent danger, whether it be from a peril insured against or not.

This being the view which we have taken of this point in the cause, independently of all adjudications on the subject, let us examine how far they should prompt us to a change of opi-

nion. Between cases of physical and moral necessity as justi-
fications for departure from the course of the voyage, the books
make no distinction, and in reason and on principle there is
none. In support of the principle for which they contend,
the counsel for the appellees have referred to three cases; one
of which is *Breed & others vs. Eaton,* 10 *Mass. Rep.* 21. The
policy was signed at *Boston,* in December 1810, on a voyage
from *Liverpool* to *Savannah;* the vessel arrived off the port of
destination on the 25th of February 1811, but being informed
of the non-intercourse law passed by the congress of the *United
States,* the captain, afraid to enter, and apprehending seizure
and confiscation, to avoid it sailed to *Amelia Island,* to wait
until he might lawfully return to *Savannah.* The underwrit-
ers being sued on this policy for a subsequent loss, their coun-
sel insisted that they were discharged by the deviation, in going
to *Amelia Island,* to avoid a risk not covered by the con-
tract of insurance; and also that the policy became void in con-
sequence of the non-intercourse law of the *United States;*
"and of this opinion, (says the reporter,) were the court." Of
what opinion? Whether that the deviation avoided the policy,
or that it became void under the non-intercourse law of the
*United States,* we are left to conjecture. But from the man-
ner in which the last position was presented to the court, being
deemed too plain to require either argument or authority to
support it, and from the promptness and brevity with which
their judgment was announced as soon as the last point in the
cause was started, it affords a very strong presumption, that upon
that only did they bottom their decision. It was not the habit
of that enlightened tribunal to decide in a way so summary and
laconic, so grave and important a question as that discussed on
the principle of deviation, and on which contradictory deter-
minations had taken place. We are aware, however, that in
*Phillips on Insurance,* 211, this case is classed as though it
turned on the point of deviation. The other two cases are
*Roget vs. Thurston,* 2 *Johns. Cases,* 248, and *O'Reilly vs. The
Royal Assurance Company,* 4 *Campbell's Nisi Prius Rep.*
246, both of which do sanction this novel and technical dis-
tinction relied on by the appellees. But *Roget vs. Thurston*
is in fact overruled by a subsequent decision of the same tribu-

nal, in which Chief Justice *Kent*, with Judges *Tompkins, Spencer* and *Thompson,* concurring, decides, that "a deviation from necessity will excuse the assured, in case of an assurance against any particular risk, as well as in case of a general insurance. There is not probably any exception, to be met with, to the application of the general principle, that if the vessel departs from the usual course of the voyage from necessity, and departs no further than that necessity requires, the voyage will still be protected by the policy." Vide *Robinson and Robinson vs. The Marine Insurance Company of New York*, 2 *Johns. Rep.* 89. In this case, the insurance being against "sea risks only," and a digression *quia timet* a peril not insured against, the court adjudged it no deviation. The appellees then can only sustain their position by the single *nisi prius* decision of Chief Justice *Gibbs*, in 4 *Campbell*, in opposition to which is the positive decision of Lord *Kenyon* in *Green vs. Elmslie, Peake N. P.* 212, which is approved of and adopted by Lord *Ellenborough* in *Livie vs. Janson*, 12 *East*, 653; and the deliberate opinion of the court of common pleas, delivered by Chief Justice *Mansfield*, after full argument, in *Scott vs. Thompson*, 4 *Bos. & Pull.* 181. In *Marshall on Insurance*, 204, it is stated, that "necessity will justify a deviation though it proceed from a cause not insured against." And the same principle is supported by *Phillips on Insurance*, 214. The weight of authorities, this court conceive, is decidedly in favour of the views they have taken of the case at bar; and in all questions of this nature we apprehend the doctrine laid down in *Stocker, et al. vs. Harris*, 3 *Mass. Rep.* 417, stands free from objection, that "the captain is the common agent of the concerned, and it is his duty to manage their distinct and separate, as well as their joint interests, according to his best judgment; and whatever is fairly done with this purpose, is within the course of the voyage; and delays, occasioned by such events, are accidents to which the insurers are *accidentally*, if not directly subjected." "Fairly done," being understood to mean, done with good intentions, and upon reasonable grounds. But admitting the law to be otherwise, there is nothing in the bill of exceptions to show that the peril sought to be avoided was one excepted out of the policy. It does not even appear that the *Two Brothers*

had any cargo on board, or that there could have been the most remote cause or apprehension of danger, "by reason or on account of any illicit or prohibited trade, or trade in articles contraband of war."

The appellees' next object, that the appellants having prayed an hypothetical instruction from the court, that they were entitled to recover if the jury believed certain enumerated facts; the effect of granting such prayer would be, to withdraw from the hands of the jury, the finding of all other facts than those specified; and would in truth be a direction, that if the jury should find the facts enumerated to be true, although they might disbelieve every other fact on which testimony had been offered, yet that the plaintiffs are entitled to recover. If such would be the operation of the instruction prayed for, it surely cannot be contended, that its refusal is matter of error, as all evidence of peril, or apprehension of peril, is excluded from the consideration of the jury, it not being one of the enumerated facts, on the finding of which their verdict is made exclusively to rest. The departure from the course of the voyage being then without apology or justification, the law affixes to it the character and consequences of deviation. Whether this be the true construction of the appellants' prayer, is not clear of doubt, and we deem it unnecessary to express any opinion on the subject.

The appellees also insist, that the testimony, offered in this cause, does not disclose any justification for the sailing of the schooner from *St. Barts* to *Marguarita*, and that on account of this deviation they are discharged from their policy. And in this we concur with them in opinion. In every contract of marine insurance the law imposes an obligation on the assured to provide a master of competent skill, prudence and discretion, to navigate the vessel; and if in a change of the course of the voyage a loss happen, which may be justly imputed to his not having provided a master of that character, the underwriters are not responsible. The mere apprehension of danger, unless founded on reasonable evidence, does not justify deviation. The court, and not the jury, are the judges whether the deviation be justifiable. *Oliver vs. Maryland Insurance Company, 7 Cranch,* 493, 4, 5; and *Patrick vs. Ludlow, 3 Johns. Cas.* 13. The peril apprehended must be such, that if encoun-

tered, loss or serious injury is the necessary consequence. The danger must be imminent and obvious, not problematical or contingent. Apply these principles to the evidence offered in the case at bar. Upon their arrival at *St. Barts,* the captain and supercargo "are informed, and had good reason to apprehend, that *St. Martha,* which at the time of the sailing from *Baltimore* was in possession of the *Patriots,* had fallen into the hands of the *Royalists,* who had, by keeping the *Patriot* flag flying, decoyed vessels into port, and seized, detained and confiscated them." Do these facts constitute an "obvious" or "imminent" danger? Is it alleged that on such former occasion *American,* or neutral vessels, were decoyed into port, seized and confiscated? Not a word of the kind. And this court are not permitted by mere implication, in the absence of all proof, to impute to the agents of a sovereign and christian nation such acts of lawless outrage and treacherous rapine. The hoisting of the *Patriot* flag by the captors of *St. Martha* can only be viewed as a *ruse de guerre* to operate on the vessels of the *Patriots,* not of neutrals. There appears, therefore, to have been no cause for the apprehension of such danger as would justify the sailing from *St. Barts* to *Marguarita.* Even suppose that neutral vessels had shared the same fate at *St. Martha,* on the occasion alluded to, with those of the *Patriots;* there is no evidence to show, that the recaptor of *St. Martha* was the same perfidious *Royalist* robber, into whose hands it had formerly fallen. And there is a total absence of testimony on which to ground an inference, that a similar system of plunder had been practised in recaptured ports by other *Royalist* commanders. On these grounds the court below were right in refusing to grant the plaintiffs' prayer that they were entitled to recover.

Their opinion, it is apprehended, may be supported on another ground. "The circumstance that a deviation takes place through the mistake or negligence of the captain, does not prevent its discharging the underwriters, since his mistakes and negligence are at the risk of the assured." See *Phil. Ins.* 223, and *Phyn and others vs. The Royal Exchange Insurance Co.* 7 *T. R.* 501. The captain is bound to know, as far as the ordinary means of information can afford such knowledge, the va-

rious ports in the course of his voyage, as well as regards their locality, as the general nature of their trade, and the relief and assistance he may expect to obtain, should he be compelled to visit them on account of any emergency arising in the prosecution of the voyage. A failure, on the part of the captain, to possess such information, is a violation of the implied engagement always imposed on the assured, that the vessels, in relation to which the insurance may be effected, is navigated by an officer of competent skill and judgment for the performance of the voyage. According to the testimony offered by the defendants, *Curracoa* is in the direct route of the voyage from *St. Barts* to *St. Martha*; is an open port, free for the reception of *Spanish* and *Colombian* vessels of war, and for the vessels of all other nations, and that constant intercourse is kept up between *Curracoa* and *St. Martha*; and that information, in relation to the last mentioned port, would be heard at *Curracoa*, in the course of three or four days, that being the usual length of the voyage between those places; and that *Curracoa* was resorted to by neutrals for intelligence as to the state of the *Spanish* Main. That *Curracoa* is a place of deposit or *entrepot* for large quantities of merchandize which are intended to be carried to the different ports on the *Spanish* Main, and which are from time to time placed there and removed according to the state of the market, and the situation of the ports on the Main, whether in possession of the *Royalists* or *Independents;* and that these facts, in relation to *Curracoa*, were well known in *Baltimore*, previous to and at the time of the sailing of said vessel on the voyage insured; and that it was well known at *St. Barts* that *Curracoa* was the nearest place to *St. Martha*, where correct information was at all times to be obtained of the state and condition of the government of *St. Martha*. That *Marguarita* is six hundred miles from *St. Martha*, whilst *Curracoa* is but three hundred; and that *Marguarita* is by one third more distant from *St. Barts* than *Curracoa*. That *Marguarita* is much out of the usual track of a voyage from *St. Barts* to *St. Martha*, and was never pursued by a vessel having *St. Martha* in view as her port of immediate destination. In justification of the conduct of the captain, without proving that *Marguarita* was a port of

more convenient access than *Curracoa*, was likely to possess the means of giving the information sought for, or for a like purpose was ever visited by any vessel on any voyage, it is proved, that the captain, "learning at *St. Barts* that *Marguarita*, a *West India* island, was the best and safest port or place at which to acquire information relative to the situation of *St. Martha*, proceeded there." How, or from what source the captain gained this intelligence does not appear. Of the facts detailed in relation to *Curracoa* he was bound to have had knowledge. If so, can it be doubted, that it was his duty to have sought the intelligence he desired at the port of *Curracoa*, the nearest and most convenient port, and that by proceeding to *Marguarita*, he committed a deviation which discharged the underwriters.

But the court were justified on another ground in refusing the plaintiffs' prayer. They could only grant it, provided that from the whole testimony offered in the case, the jury were warranted in finding the facts specially enumerated therein, and all other facts necessary to support the action; notwithstanding it be admitted that all the evidence offered by the defendants is true, (except so far as the same may be contradicted by the finding of the specific facts contained in the prayer,) no matter how strong may be the contradictory testimony produced by the plaintiffs. Upon any other principle the court would have transcended the limits prescribed to their powers, and invaded the undeniable and exclusive prerogative of the jury, viz. the right of deciding on all matters of fact, as to which contradictory evidence may be adduced. What is the instruction prayed? That the court direct the jury, "that if they should believe, that upon the arrival of the vessel insured, at *St. Barts*, it was generally reported that *St. Martha* was in possession of the *Royalists*, and that the master and supercargo were informed at *St. Barts*, and verily believed, that *Marguarita* was the best and nearest place to obtain information relative to the situation of *St. Martha*, and that the master of said vessel, in the exercise of an honest and sound discretion, went to *Marguarita* for information, that proceeding thereto was no deviation, and that the plaintiffs were entitled to recover for a total loss." How could the court authorise the jury to find the

fact, that *Marguarita* was the *nearest* port to obtain information relative to the situation of *St. Martha,* without one particle of testimony, on the part of the plaintiffs, to establish that fact; and in opposition to its conclusive refutation by positive proof adduced by the defendants. We conceive it to be the peculiar duty of courts of original jurisdiction, imposed on them for the wisest and best purposes, when applied to, in cases where either no testimony is offered of a fact, or the proof is so vague and indefinite, that by no rational inference can the fact attempted to be proved be deduced, to instruct the jury, that from the testimony offered, it is not competent for them to find such fact. The inconsistency of the court, therefore, would have been most conspicuous, had they by express instruction encouraged the jury to find *Marguarita* the *nearest* port, not only without proof, but against that of the most clear and unequivocal character.

The court were right in rejecting the prayer for another reason. The facts being admitted, the question of deviation is a matter of law for the decision of the court. Considering, then, the testimony in the cause in the way in which it is before stated, the court were bound to receive it in reference to this prayer. Is it possible that any court of judicature, (let the intentions of the captain have been never so honest,) would instruct a jury, that under the circumstances of this case, whilst impelled by no imminent peril, but proceeding merely to enquire into the truth of a public rumour, they were authorised to find, that in going to *Marguarita,* instead of *Curracoa,* he acted in the exercise of "a sound discretion?" We think not. His conduct must be imputed to that gross ignorance and want of judgment, which discharges the underwriters.

Much stress was laid, in the argument, on the statement in the bill of exceptions, that the plaintiffs "proved" such and such facts. We receive it as meaning nothing more, than that he offered evidence thereof.

BUCHANAN, Ch. J. dissented.

JUDGMENT AFFIRMED.